All right, we will move on to the ING Bank Appeals. I was anxious to go up here. I apologize. Apologies, it takes me a minute here after all that. Mr. Paulson, take your time. I'm going to address a couple of things Mr. Sims just said that are applicable generally and then take a step back and move on to the provided piece. First, Mr. Sims and I think one other attorney, perhaps Mr. Power, used the term commission. There are no commissions. There is no brokerage at stake in any of these cases. These are contracts of purchase and sale. As Mr. Sims mentioned early in the going, the O.W. terms and conditions call for payment without set offer deduction. The O.W. physical suppliers are entitled to full payment and so on down the line. The problem here and what makes these cases different in the maritime area but not so different from other areas where you have had a massive overnight collapse of a corporation, here the music stopped. The music stopped on November 7th. Bills weren't paid, physical suppliers weren't paid, banks weren't paid, etc. Insolvency, particularly when it comes in a free fall, is a very messy thing. All of these parties have rights against their contractual counterparties up the chain and the bank against its borrowers in their various insolvency proceedings worldwide. There is no talk of commissions. These are contracts. These are unpaid parties where people have claims in bankruptcy. My understanding is that the claims in the U.S. bankruptcies, that's O.W. USA and O.W. North America, where, for instance, O'Rourke has made its claims, are robust. And I believe O'Rourke also has an administrative claim under Section 503B9. So parties have done this and the physical suppliers have also proceeded, as we know now, against non-debtor vessels. But a couple of things. There have actually been two trials here. One was Barcliffe. One was Martin. The district court in Martin did entertain and reject the L4 arguments. I don't believe it because I just looked that they're mentioned in the Eleventh Circuit opinion, but they were rejected below. Martin. Martin is not a Rule C case. It's not an arrest case. It's a case where a physical supplier seized a ship, attached a ship under Rule B, a sister ship of the ship to which the bunkers were supplied. So there was no raise before the court against which a lien could attach. In connection with the summary judgment motion argument in that case, Judge Hinkle indicated that he would look at the lien law to guide him on the equities. But ultimately, he ended up ruling that there could be multiple liens, something no court in the United States construing Kim law has ever done before. In fact, the concept of stricter jurists, the concept of uniformity under maritime law, numerous cases explain that these statutes are strictly construed to avoid a multiplicity of liens. So we argue that one April 13th before the Eleventh Circuit, and I expect the result might be different. And I think I'll just leave Martin there. Also, Martin turned largely on issues of Florida contract and crazy contract law, which is somewhat different than arguments that have been made in the unjust enrichment and crazy contractual arguments in these cases. So Martin is in opposite. Let's move on to provided. And maybe I'll start with just a little history. The law is old. We cite in our cases an article written in 1908 by Mr. Smith about the confusion in the maritime lien space that led to the 1910 Act. What do you think Judge Forrest got wrong? If I can take two steps back before I answer. Two steps forward, two steps back. I just want to know your best guess. What do you think Judge Forrest got wrong and why? Until her decision, the concept that there was some requirement of risk, which was not briefed, or the concept that was briefed but not decided, that somehow a contract supplier had to show that it paid its subcontractors before it, quote, provided necessaries and proceeded to a lien, was nonexistent. So it was without real precedent, so that makes it somewhat perhaps suspicious. What was wrong? What's wrong is that it adds to a very simple statutory requirement that a person supply necessaries to a vessel on the order of the owner or a person authorized by the owner. If, as in all of these cases, the fuel got aboard, the provision had taken place. It was undisputed in every case except this. And pretty much every other lien case that you look at. What happened here and where Judge Forrest incredibly complicated a simple concept is that the question really isn't who put it on, but who put it on on the order of the owner. And so there's no question in these cases that the fuel was pumped aboard the ship. That's the provision. But Judge Forrest added this new requirement for providing that you be on risk, never before seen in any jurisprudence anywhere. And what the parties did brief that, you know, for a contract supplier such as O.W. Middle East or O.W. Malta to have a lien, it must first pay its subcontractors. That was briefed extensively, and our position was that would create, one, a multiplicity of liens and add a temporal concept to the concept of provided that didn't exist before. The lien arises when the goods are provided to the ship. Well, the providers aren't ExxonMobil, right? I'm sorry? The providers are not ExxonMobil. They're not Shell. They're not major international corporations that produce petrochemical products that become diesel fuel, are they? The providers in Mr. Sims's clients are people who have relationships with other companies that produce and manufacture fuel oil or diesel fuel, right? The bunker space is a specialty space. Some of the big oil majors are in it. Some of them are not. But his clients are not them. His clients are not them. New Star, for instance, is a very big company. Martin is a very big company. If the charters had directly ordered it from Mr. Sims's clients, then Judge Forrest's requirement would be that his clients wouldn't have a lien until they had shown that they had paid whomever they bought the product from, wouldn't they? That's what she imposed on you. I think I understand your hypothesis. It gives you a headache. It gives me a headache. But that's exactly what she did, wasn't it? She said that you didn't have a lien because you couldn't show that you had any financial risk. Yes. Because you hadn't paid anybody. And she said in a footnote, had you paid the suppliers, you might be different. I think that's part of the evidentiary nature of her decision, however. She doesn't explain it. Had the parties been paid, two of the three groups of physical suppliers in this group of cases. I'm just pointing out that I think it's crazy. It doesn't make sense. So you could go down the chain. There are distribution companies. I was raised in the oil industry. My father worked for an oil company. There are distributors who are independent contractors of other distributors along a broad chain of distribution of petroleum products throughout the country. And there are manufacturers and there are refiners. And so what would we do? Would we chase the product all the way back to its origination? Is that what we would do? I don't think so. That would be very complicated. The statute doesn't require it. The statute is supposed to be simple and provide predictability to vessel owners and material women. It doesn't say, and the provider having paid for the product. It just says provide, right? That's correct. And in this case, in two of the three cases that I'm arguing right now, the physical suppliers were paid and the judge didn't recognize that. But I think that . . . If you think that's irrelevant, then you shouldn't trouble yourself with it, at least as far as I'm concerned. But I do think when she said that the case might have been different, she was saying that from an evidentiary point of view, then I'd have my proof. I think that's what she's saying, but I'm not sure. So she acknowledged that there at least was some contractual obligation had the payments been made? I'm not sure, Your Honor. Well, she had the contract between O.W. and the charters in front of her. She did. She had the sales order contract. In fact, right is an item of property and has a risk with it for failure to perform. Absolutely. Absolutely. But I think just to kind of go back a little bit with the history, this used to be simpler. A ship would pull up to a pier. The master or the chief officer who were cloaked with authority under the statute would say, fill her up, and that would be it. And now we have these contract changes. It's more complicated, but the law is the same. And just go back to those three requirements. And it turns on the order of the owner or the person authorized by the owner. The parties here that fill the bill are the O.W. entities and not the physical suppliers, as every court except Martin has found, although Martin gave ING a lien too. And then the court granted sua sponte on an issue that had not been briefed, or after deciding the case on an issue that had not been briefed, for the vessel owners. And, again, rejected out of hand the motion for re-argument. And so we believe on that basis this decision should be reversed. Do you think the material that you put in on reconsideration, to your mind, and if we are adopting the best way of looking at this, is relevant at all? I mean, or did you satisfy your burden by showing we have a contract with the charterer and then the fuel oil ended up on the ship? We satisfied our burden under the statute? And that's the end of it. I don't think there was any dispute that we'd satisfied our burden, at least between the parties. Nobody said you hadn't, did they? What's that? None of the parties said that you hadn't. Not to my recollection. But it's not hard to assemble the contractual chain. We did that and put it in. And it was rejected as being simply re-argument, yes. Do you think that the contractual chain has any relevance to the conclusion you're urging on us? The contractual. With respect to the application of the statute. The contractual chain has relevance to the question of who took the order for necessaries on the order of the owner or a person authorized by the owner. Again, you get to the analysis we talked about. The answer to that is a word, is a name, right? It's the contract supplier gets the lien if they took the order. And the physical supplier does not unless there's a chain of agency agreements or there's some selection by the owner of the subcontractor, period. That's what all the other cases say. That's what this case should say as well. And if I could just talk a moment about fraud. About fraud? Mr. Power, in his arguments, and this is true, too, the arguments in the Gewor case say that without, in two of the three cases, pleading it at all, that based on a trustee's report that indicated that the Board of Directors of OW in October of 2014 determined that they would defer payments to suppliers while on the brink of insolvency. That this is somehow fraud. In a footnote, it implicates that somehow the bank was involved in it and that the lien claims should be rejected as being in bad faith. This argument is a red herring. Mr. Power and his clients are appellees in this case. This was not addressed by the court below. The implication that our client was involved in some wrongdoing as opposed to the simple financial distress of a big company is wrongful. And the fact is that financial distress is not fraud. That's the countrywide case. The fact that companies in trouble decide to defer payments, I'll bet that happens in every company that ever went bankrupt ever. So this innuendo and argument about... Who was it who went to jail here? There was fraud in the Singapore affiliate. That's what caused the losses that brought the company down almost overnight. And people in Singapore, and I can't remember exactly who, did go to jail. Mr. Power in his brief says the CEO and the CFO were indicted, but neglects to say, even though it happened before his brief was filed, is that they were cleared. The trustee's report focuses on derivatives trading and what happened in Singapore. It does reference that the company was looking to defer payments, but it doesn't say we're never going to pay anybody or we're going to enter into contracts with our fingers crossed behind our back. There's no finding of fraud below. There's no finding of fraud below. There's no allegation of fraud below. There was no discovery on fraud below. So it's a red herring. It should be rejected. Thank you. Thank you. Thank you very much. Mr. Power. So I would like to, again, just set the stage, expanding what we now really understand what ING's role here to be. ING has suggested it has a $700 million revolving line of credit. ING has suggested that some of that line of credit was drawn down. I don't think there's a— Is any of that disputed? Well, what I'm getting to is we don't have OW here. We don't have the contract party to every one of these appellees or the purchaser of the fuel. They're not here. They're not sitting at the table. Who's arguing on their behalf is ING. What I think is very important— ING was a bank that had a facility that was financing this company, and the way it financed it was it would advance them money and— The record is devoid. Not one penny financed by ING was used to purchase fuel to go on any of these vessels. That's the irony here. What you have— Irony, but it's an irrelevant irony. It's not irrelevant because what we have is if we're looking at who did what wrong and why Judge Forrest was correct— We're looking at contracts and trying to decide whether a statutorily created link supplies. That's what we're doing. And so if we look at the out-of-pocket context that Judge Forrest based her ruling upon— ING is a bank. The company goes to the bank and says, I want to draw down $50 million first of the month. Right. And it may use some of it for electricity. It may use some of it for bonuses. It may use some of it for bunkers. I mean, that's just a—we're just talking about a standard commercial— Talking about Judge Forrest's ruling, which was appealed, our suggestion as the vessel owners is that the results are 100 percent correct, that neither party, O.W. and by implication as alleged S&E, ING has a lien or the physical suppliers. And the reason that is is Judge Forrest based it on several important considerations involving the express language and the context when you look at it in an Admiralty scenario of the statute, which is the only way you can get a lien. So Judge Forrest clearly determined, which is the correct result, that you have to be a good-faith provider of necessaries in order to get a lien. So the question is just not what is a provider. The question is what is a good-faith provider. Are you assuring me that she said those exact words? I can read you. In her opinion. On page 14— Could you give us—that's in the joint appendix? Joint appendix, page 45. Okay. So Judge Forrest acknowledges the legislative history surrounding Simla and its predecessor statutes confirm that its purpose is to facilitate maritime commerce by protecting terminal operators, ship chandlers, ship repairers, stevedores, and other suppliers who in good faith furnish necessaries to the vessel. And she cites a House report on the legislative history. Expecting to be paid, right? Peoples who supply necessaries expecting to be paid. The good faith has nothing to do with expecting to be paid. So, for example, if O.W. on the eve, knowing that they were insolvent, they couldn't pay anyone, made a mad rush to simply create a lien where they shouldn't have been engaged in business to begin with, that is not supplying necessaries in good faith. That's your question. Did your folks get their bunkers? Did you get the bunkers? The owners did not get anything. The charters got the bunkers. Let me make it clear. Did the ships get the bunkers that they ordered? Bunkers were delivered to the vessels. Does it make sense that somebody ought to be paid? Yeah. Well, it does. But the question is not whether or not should somebody be paid. It's whether a maritime lien was created. Remember, there's a contract party that's missing here. O.W. and I.N.G. has every legal right to go after the contract party. What we're talking about is liens, and that's why these cases are slightly different than the Maritime King case, where the party who contracted for the fuel stepped up and paid. I totally get that because there's a gloss of a bankruptcy over it. That's the problem. There's not enough money to go around. But just because there's not enough money doesn't mean that a lien was created. So that's where we have to . . . Let me ask you this. Has the judge ever decided whether I.N.G. is a legitimate assignee? No. Okay. And so if we make a decision that says that there is a problem with at least your analysis about the existence of the lien, I.N.G. still has to go back and prove that its assignment is legitimate, doesn't it? It does. And so therefore any of I.N.G.'s bad acts then become relevant but are completely irrelevant right now, are they not? Are they not? To some degree, yes. Okay. They would be . . . To what degree aren't they? Well, because . . . Wait, now stop. Wait. Because either I.N.G. was doing something wrong during this contract or it wasn't. And the answer is it wasn't. It was O.M.W. or whoever that was doing something wrong. And so whatever I.N.G. was or wasn't doing is irrelevant, right? Yeah. I.N.G. has nothing to do with that. Okay. Got it. Yes. But the question is on remand if the panel looks and feels that that is appropriate for certain reasons that I'm hearing, certain limited reasons perhaps . . . I'm just suggesting that if we did . . . If you did, yes. . M T w  . . . . . . . . . . . . . . an ed ing p o d